Slip Op. 16-81

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **WHIRLPOOL CORPORATION,** | |
| Plaintiff, | |
| v. | |
| **UNITED STATES**, | **Before: Timothy C. Stanceu, Chief Judge** |
| Defendant, | **Court No. 14-00199** |
| and | |
| **ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE,** | |
| Defendant-Intervenor. | |

## OPINION

[Affirming a decision made in response to court order in an action contesting a ruling on the scope of antidumping and countervailing duty orders on aluminum extrusions from China]

Dated: August 26, 2016

*Donald Harrison*, Gibson, Dunn & Crutcher, LLP, of Washington, DC, for plaintiff.

*Aimee Lee*, Senior Trial Counsel, Civil Division, U.S. Department of Justice, of New York, NY, for defendant. With her on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director. Of counsel on the brief was *David P. Lyons*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

*Alan H. Price* and *Robert E. DeFrancesco, III*, Wiley Rein LLP, of Washington, DC, for defendant-intervenor.

Stanceu, Chief Judge: Plaintiff Whirlpool Corporation ("Whirlpool") challenged a 2014

decision of the International Trade Administration, United States Department of Commerce

("Commerce" or the "Department") interpreting the scope of antidumping and countervailing

duty orders on aluminum extrusions from China to include two types of kitchen appliance door

handles imported by Whirlpool.  In an opinion and order, the Court denied plaintiff's motion as

to one type of appliance door handles, each of which consisted of a single piece that was

fabricated from an aluminum extrusion, and granted it as to a second type of handles, which were

assemblies.  In response, Commerce has decided, under protest, that the assembled handles are

outside the scope of the antidumping and countervailing duty orders on aluminum extrusions

from China (the "Orders").  Whirlpool supports this decision.  Opposing the determination

Commerce reached on remand is the Aluminum Extrusions Fair Trade Committee ("AEFTC"),

an association of domestic aluminum extrusion producers that was a petitioner in the underlying

antidumping and countervailing duty investigations and is a defendant-intervenor in this

proceeding.  The court affirms the Department's decision in the Remand Redetermination that

the assembled handles are outside the scope of the Orders.

## I. BACKGROUND

Presented below is background to supplement the background provided in the court's

earlier opinion and order, *Whirlpool Corp. v. United States*, 40 CIT __, 144 F. Supp. 3d 1296,

1298-99 (2016) ("*Whirlpool I*").

### A.  Decisions Reviewed by the Court in this Litigation

Commerce issued the decision originally contested in this litigation (the "Final Scope

Ruling") on August 4, 2014.  *Final Scope Ruling on Kitchen Appliance Door Handles*,

A-570-967, C-570-968 (Aug. 4, 2014) (First Admin.R.Doc. No. 11), *available at*

http://enforcement.trade.gov/download/prc-ae/scope/46-kitchen-door-handles-4aug14.pdf (last

visited Aug. 19, 2016) ("*Final Scope Ruling*").[1]

---

[1] Citations to "First Admin.R.Doc." refer to documents placed on the record by
Commerce in Parts A.1 and A.3 of the administrative record, which refer to the assembled
handles.  Citations to "Second Admin.R.Doc." refer to documents placed on the record by
(continued…)

The contested determination now before the court (the "Remand Redetermination") is the

decision Commerce issued in response to the court's order in *Whirlpool I.  Results of*

*Redetermination Pursuant To Court Remand* (Apr. 15, 2016) (Remand Admin.R.Doc. No. 3)

("*Remand Redetermination*").

<u>B.  Administrative Proceedings Conducted by Commerce</u>

Commerce issued the antidumping and countervailing duty orders on aluminum

extrusions from China (the "Orders") on May 26, 2011.  *Aluminum Extrusions from the People's*

*Republic of China: Antidumping Duty Order*, 76 Fed. Reg. 30,650 (Int'l Trade Admin.

May 26, 2011) ("*AD Order*"); *Aluminum Extrusions from the People's Republic of China:*

*Countervailing Duty Order*, 76 Fed. Reg. 30,653 (Int'l Trade Admin. May 26, 2011) ("*CVD*

*Order*").

On December 20, 2013, Whirlpool filed a request for a scope ruling on the appliance

door handles that remain at issue in this case, i.e., the assembled handles.  *Letter Requesting a*

*Scope Inquiry Regarding Kitchen Appliance Door Handles With End Caps* 7 (First

Admin.R.Doc. No. 1) ("*First Scope Ruling Request*").  On March 19, 2014, Whirlpool responded

to a Department questionnaire regarding its submission.  *Resp. of Whirlpool Corp. to the Dep't's*

*Supp. Questionnaire on Scope Inquiry Regarding Kitchen Appliance Door Handles With End*

*Caps* (First Admin.R.Doc. No. 7) ("*Supp. Questionnaire Resp.*").

Whirlpool filed a second scope ruling request, on January 8, 2014, for one-piece

appliance door handles, each of which was fabricated from an aluminum extrusion.  *Letter*

_____

(continued…)

Commerce in Parts B.1 and B.3 of the administrative record, which pertain to the one-piece
handles.  Citations to "Remand Admin.R.Doc." refer to documents placed on the record of this
remand proceeding.

*Requesting a Scope Inquiry Regarding Kitchen Appliance Door Handles Without End Caps* 4

(Second Admin.R.Doc. No. 1).  On March 19, 2014, Whirlpool filed a response to the

Department's questionnaire on this type of handles.  *Resp. of Whirlpool Corp. to the Dep't's*

*Supp. Questionnaire on Scope Inquiry Regarding Kitchen Appliance Door Handles Without End*

*Caps* (Second Admin.R.Doc. No. 7).

On August 4, 2014, Commerce issued the Final Scope Ruling, in which it determined that

both types of Whirlpool's appliance door handles are within the scope of the Orders.  *Final*

*Scope Ruling*.

<u>C.  Proceedings before the Court of International Trade</u>

Whirlpool commenced this action on August 26, 2014.  Summons, ECF No. 1; Compl.,

ECF No. 6.  On February 23, 2015, Whirlpool filed a motion for judgment on the agency record,

arguing that Commerce impermissibly placed both handle types within the scope of the Orders.

Pl.'s Mot. J. Agency R., ECF No. 26 ("Pl.'s Br.").  Defendant and defendant-intervenor

responded on June 2, 2015.  Def.'s Opp'n to Pl.'s Mot. J. Agency R., ECF No. 36 ("Def.'s

Opp'n"); Def.-Int.'s Resp. Pl.'s Mot. J. Agency R., ECF No. 35 ("Def.-Int.'s Opp'n").  On

July 13, 2015, Whirlpool filed a reply.  Pl.'s Reply Br. to Def.'s Opp'n to Pl.'s Mot. J.

Agency R., ECF No. 42.  The court held an oral argument on October 8, 2015.  ECF No. 47.

On February 1, 2016, the court issued *Whirlpool I*, affirming the Department's

determination that the one-piece handles were within the scope of the Orders but remanding the

Final Scope Ruling to Commerce for reconsideration of the decision that the assembled handles

were within the scope.  *Whirlpool I*, 40 CIT at __, 144 F. Supp. 3d at 1307.

Following the court's ruling in *Whirlpool I*, Commerce issued a draft redetermination

("Draft Remand Redetermination") on March 18, 2016 and invited the parties to comment.

*Draft Results Of Redetermination Pursuant To Court Remand* (Mar. 18, 2016) (Remand

Admin.R.Doc. No. 1).  Defendant-intervenor filed comments on the Draft Remand

Redetermination on March 24, 2016.  *Petitioner's Comments on Department's Draft Remand*

*Results* (Remand Admin.R.Doc. No. 2).

        Commerce issued the Remand Redetermination on April 15, 2016, on which Whirlpool

submitted comments on May 13, 2016, Pl. Whirlpool Corp.'s Comments on Final Results of

Redetermination Pursuant to Court Remand, ECF No. 53, and on which AEFTC submitted

comments on May 16, 2016, Def.-Int. Aluminum Extrusions Fair Trade Committee's Comments

on Final Results of Redetermination Pursuant to Court Remand, ECF No. 55 ("Def.-Int's

Comments").  Defendant responded to these comments on June 3, 2016.  Def.'s Resp. to Remand

Comments, ECF No. 59.

## II. Discussion

### A.  Jurisdiction and Standard of Review

        The court exercises subject matter jurisdiction under section 201 of the Customs Courts

Act of 1980, 28 U.S.C. § 1581(c), which grants jurisdiction over civil actions brought under

section 516A of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. § 1516a.[2]  Among the decisions

that may be contested in this Court under Section 516A is a determination of "whether a

particular type of merchandise is within the class or kind of merchandise described in an . . .

antidumping or countervailing duty order."  *Id*. at § 1516a(a)(2)(B)(vi).  In reviewing the

contested scope ruling, the court must set aside "any determination, finding, or conclusion found

. . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with

law."  *Id*. § 1516a(b)(1)(B)(i).

_____

        [2] All citations to the United States Code are to the 2012 edition.

B.  Description of the Merchandise in Whirlpool's First Scope Ruling Request

The merchandise remaining at issue, which was the subject of Whirlpool's first scope ruling request, consisted of 38 models of handles for a variety of kitchen appliances. *Whirlpool I*, 40 CIT at __, 144 F. Supp. 3d at 1299 (citing *First Scope Ruling Request* Attach. 1). Thirty-two of these handles were made for specific models of refrigerators, four were made for specific models of ranges, one was made for a single dishwasher model, and one was made for a single electric oven model.  *Id.* (citing *First Scope Ruling Request* Attach. 1).  As the court stated in *Whirlpool I*, "[t]he record indicates some variation in the assemblies, but a fact common to all models is that each handle has within the assembly a single component that is fabricated from an aluminum extrusion and then surface coated (by, for example, brushing, anodizing, or painting)." *Id.*  "Also common to each handle in Whirlpool's first scope ruling request is the presence of plastic end caps that are attached to the aluminum component by screws."  *Id.* (citing *First Scope Ruling Request* 7, 16-17).  The court added that "[a]s imported into the United States, all assembled handles covered by this request 'are fully manufactured, assembled and completed, with no further processing of the handle required.'"  *Id.*, 40 CIT at __, 144 F. Supp. 3d at 1300 (quoting *First Scope Ruling Request* 7).

C.  The Scope Language in the Orders

The scope language of the antidumping duty order and the scope language of the countervailing duty order are essentially equivalent.  The orders apply to "aluminum extrusions which are shapes and forms, produced by an extrusion process, made from aluminum alloys having metallic elements corresponding to the alloy series designations published by The Aluminum Association commencing with the numbers 1, 3, and 6 (or proprietary equivalents or other certifying body equivalents)."  *AD Order*, 76 Fed. Reg. at 30,650; *CVD Order*, 76 Fed.

Reg. at 30,653.  Such extrusions may be "produced and imported in a wide variety of shapes and

forms," and, after extrusion, may be subjected to drawing and to further fabrication and

finishing.  *AD Order*, 76 Fed. Reg. at 30,650; *CVD Order*, 76 Fed. Reg. at 30,654.

The scope of the Orders includes aluminum extrusions that are "described at the time of

importation as parts for final finished products that are assembled after importation" or

"identified with reference to their end use."  *AD Order*, 76 Fed. Reg. at 30,650-51; *CVD Order*,

76 Fed. Reg. at 30,654.  To be subject to the Orders, however, such merchandise must

"otherwise meet the definition of aluminum extrusions."  *AD Order*, 76 Fed. Reg. at 30,651;

*CVD Order*, 76 Fed. Reg. at 30,654.

The Orders exclude from the scope certain finished merchandise "containing aluminum

extrusions as parts that are fully and permanently assembled and completed at the time of entry,

such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane

and backing material, and solar panels."  *AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed.

Reg. at 30,654.

<u>D.  The Court Affirms the Department's Decision that the Assembled Handles Are Outside the
Scope of the Orders</u>

<u>1.  The Court's Decision in *Whirlpool I*</u>

In *Whirlpool I*, the court began its analysis with the general scope language, i.e., the

language of the Orders absent specific exclusions.  Under the general scope language, the court

reasoned, "aluminum extrusions" subject to the Orders are "shapes and forms, produced by an

extrusion process . . ." from specified aluminum alloys.  *Whirlpool I*, 40 CIT at __, 144 F.

Supp. 3d at 1300 (quoting *AD Order*, 76 Fed. Reg. at 30,650; *CVD Order*, 76 Fed. Reg.

at 30,653).  The court stated, further, that "[t]he scope of the Orders includes goods made of the

specified aluminum alloys that resulted from an extrusion process but also were subjected to

certain specified types of industrial processes after extrusion." *Id.* The court added that "[t]hese

post-extrusion processes are drawing, fabricating, and finishing; the scope language provides

non-exhaustive lists of types of fabricating and finishing operations." *Id.* Observing that

"[n]otably absent from the identified post-extrusion processes are assembly processes," the court

reasoned that "the term 'extrusion' is not defined in the general scope language so as to include a

good simply because an extruded aluminum component is present within a good consisting of an

assembly." *Id.*, 40 CIT at __, 144 F. Supp. 3d at 1302. Addressing scope language providing

that subject aluminum extrusions may be "described at the time of importation as parts for final

finished products that are assembled after importation" or "identified with reference to their end

use," the court, citing the express language of the scope, concluded that this language is limited

by the qualification that goods so described or identified are within the scope only if they

*"otherwise meet the definition of aluminum extrusions." Id.* (quoting *AD Order*, 76 Fed. Reg.

at 30,650-51; *CVD Order*, 76 Fed. Reg. at 30,654 (emphasis added)).

    The court next addressed the "subassemblies provision," *id.*, which places within the

scope of the Orders "aluminum extrusion components that are attached (e.g., by welding or

fasteners) to form subassemblies, i.e., partially assembled merchandise unless imported as part of

the finished goods 'kit' defined further below." *AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*,

76 Fed. Reg. at 30,654.[3] The court concluded that "[t]his is the only general scope language that

---

[3] The referenced "finished goods 'kit'" definition is part of the "finished goods kit
exclusion," in defining which the Orders state as follows:

> The scope also excludes finished goods containing aluminum extrusions that are
> entered unassembled in a "finished goods kit." A finished goods kit is understood
> to mean a packaged combination of parts that contains, at the time of importation,
> all of the necessary parts to fully assemble a final finished good and requires no
> further finishing or fabrication, such as cutting or punching, and is assembled "as

(continued…)

reasonably can be interpreted to expand the scope beyond goods consisting solely of a single

extrusion, but this sentence, notably, refers to 'partially assembled merchandise.'" *Whirlpool I*,

40 CIT at __, 144 F. Supp. 3d at 1302.  The court noted that Commerce, in the Final Scope

Ruling, had not relied upon the subassemblies provision in placing Whirlpool's assembled

handles within the scope of the Orders; this was "understandable," according to the court,

because the subassemblies provision applies only to partially assembled merchandise whereas

the handles were "imported in a form in which they require no further assembly or processing

prior to the intended use." *Id*., 40 CIT at __, 144 F. Supp. 3d at 1303 (citing *Final Scope

Ruling* 5).

The court reasoned that the Final Scope Ruling was flawed because it failed "to address

in any meaningful way the question of whether the general scope language describes the

assembled handles" and because, after mentioning the definition of "extrusion" in the general

scope language, it proceeded "directly to a discussion of whether these goods satisfy either the

finished merchandise exclusion or the finished goods kit exclusion." *Id.*, 40 CIT at __, 144 F.

Supp. 3d at 1302-03 (citing *Final Scope Ruling* 17).  The court opined in *Whirlpool I* that "[a]fter

a discussion of the two exclusions, the Final Scope Ruling states, in conclusory fashion, that 'we

find that the handles at issue fall inside the language of the scope that includes "aluminum

_____

(continued…)

is" into a finished product. An imported product will not be considered a "finished
goods kit" and therefore excluded from the scope of the investigation merely by
including fasteners such as screws, bolts, etc. in the packaging with an aluminum
extrusion product.

*Aluminum Extrusions from the People's Republic of China: Antidumping Duty Order*, 76 Fed.
Reg. 30,650, 30,651 (Int'l Trade Admin. May 26, 2011); *Aluminum Extrusions from the People's
Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 30,653, 30,654 (Int'l Trade Admin.
May 26, 2011).

extrusions which are shapes and forms, produced by an extrusion process."'" *Id.* (quoting *Final Scope Ruling* 18). The court did not consider the assembled handles to conform to this definition and pointed out the distinction between "extrusions" as defined in the scope language and "assemblies, each of which contains an extrusion, machined and surface-treated, as the principal component." *Id.*, 40 CIT at __, 144 F. Supp. 3d at 1302. Viewing as unreasonable an interpretation of the general scope language to include the assembled handles, the court held that the Final Scope Ruling was "contrary to law and must be set aside." *Id.*, 40 CIT at __, 144 F. Supp. 3d at 1303.

The court also analyzed the applicability of the finished merchandise exclusion to the assembled handles, even though this analysis was unnecessary to the decision to order a remand of the Final Scope Ruling. *Id.*, 40 CIT at __, 144 F. Supp. 3d at 1303-04. The court stated that Commerce had failed to demonstrate that the assembled handles, if presumed to fall within the general scope language, would not qualify under the plain language of that exclusion. *Id.* ("Commerce presents no convincing reason why the plain language of this exclusion, which appears to describe the assembled handles, would not be dispositive were the general scope language presumed to describe these goods."). *Id.*, 40 CIT at __, 144 F. Supp. 3d at 1304. The court considered Commerce to have decided that the presence of what Commerce considered "fasteners" within an assembly is to be disregarded when the finished merchandise exclusion is applied and, in so doing, to have relied unjustifiably on a reference to "fasteners" in a different exclusion, the finished goods kit exclusion. *Id.* The court further concluded that "Commerce also employed flawed logic and ignored record evidence in concluding that the plastic end caps in the assembled handles are 'fasteners.'" *Id.*, 40 CIT at __, 144 F. Supp. 3d at 1304-05. As the court stated, "[r]elying on a dictionary definition of 'washer' as a 'flat thin ring or a perforated

plate used in joints or assemblies to ensure tightness, prevent leakage, or relieve

friction,' . . . Commerce found that the plastic end caps 'are analogous to a washer' because they

'allow[ ] the handle to fit tightly to the refrigerator door'; Commerce further found, without

evidentiary support in the record, that the plastic end caps 'relieve[ ] friction between the door

and the handle.'" *Id.*, 40 CIT at __, 144 F. Supp. 3d at 1305 (citing *Final Scope Ruling* 17)

(internal citation omitted).  As to the lack of substantial evidence to support the Department's

finding, the court stated that "[t]he record evidence is that the end caps are made of plastic, are

designed for their specific application, and are attached to the aluminum extrusion component

'by means of screws.'" *Id.* (citing *First Scope Ruling Request* 7, 16-17).

 *Whirlpool I* directed Commerce to reconsider its decision placing the assembled handles

within the scope of the Orders and to "reach a new determination as to whether the assembled

handles are covered by the scope, bearing in mind that it must interpret reasonably the scope

language it chose upon promulgating the Orders."  *Id.* (citing *Duferco Steel, Inc. v. United States*,

296 F.3d 1087, 1097-98 (Fed. Cir. 2002)).

2.  The Department's Remand Redetermination

 In the Remand Redetermination, Commerce decided "under respectful protest[ ] that

handles with end caps are outside the scope of the *Orders* because, consistent with the Court's

interpretation of the scope language, there is no general scope language which covers such

products."  *Remand Redetermination* 8 (footnote omitted).  Commerce further decided that, as a

result, it was unnecessary to address whether the assembled handles meet the conditions for the

exclusions to the Orders.  *See id.* at 8, 14.

 The court affirms the Department's decision that the assembled handles are not within the

scope of the Orders.  However, the court does not affirm all of the statements Commerce

included in the Remand Redetermination.  Most notably, when responding to defendant-

intervenor's comments in the Remand Redetermination, Commerce included statements that

appear to misinterpret certain aspects of the court's opinion and order in *Whirlpool I*, as

discussed below.  Nevertheless, the Remand Redetermination is sufficient to allow the court to

affirm, on the reasoning the Department presents, the decision that the assembled handles are

outside the scope of the Orders.  The Remand Redetermination adopts, albeit under protest, the

same analysis that the court applied in *Whirlpool I* to conclude that the general scope language

does not include the assembled handles.

In addressing AEFTC's position that the assembled handles are covered by the Orders on

the premise that the plastic end caps are "fasteners," Commerce stated that it agrees with

defendant-intervenor that "both the scope language and the record evidence support a finding

that the plastic end caps in question should be treated as fasteners, and, therefore, Whirlpool's

handles with end caps consist solely of aluminum extrusions and fasteners."  *Id.* at 10.

Commerce added that it could not rule in this way consistent with the court's opinion and order

in *Whirlpool I* because "the Court has made a specific finding that, based on the scope language

and this same record evidence, the plastic end caps are not fasteners."  *Id.* (footnote omitted).

However, the court did not make a "finding" that the plastic end caps are not fasteners.  It is not

the court's role to make findings but instead to determine whether the Department's findings are

supported by substantial evidence on the record and whether the Department's conclusions are

otherwise in accordance with law.  As discussed previously in this Opinion, the finding that the

end caps are "fasteners" was flawed based on the record evidence, and it was inconsistent with

the definition of the term "washer" upon which Commerce itself relied.  The conclusion that

treating the end caps as fasteners results in the inclusion of the assembled handles within the

scope of the Orders was also flawed, as it was based on a misinterpretation of the scope

language.

The Remand Redetermination also appears to misinterpret the court's discussion in

*Whirlpool I* of the subassemblies and parts provisions in the scope language.  In addressing

AEFTC's opposition to the Department's position that it need not analyze the applicability of the

scope exclusions to Whirlpool's assembled handles because they are not within the ambit of the

general scope language, Commerce stated that "although the Court identified additional general

scope provisions, i.e., the 'parts' language and 'subassemblies' language, which also could be

considered relevant, *the Court ultimately found that, based on the record evidence, these*

*provisions would not support a finding that Whirlpool's handles with ends caps are covered by*

*the* Orders."  *Remand Redetermination* 12-13 (emphasis added).  However, the court never held

that the subassemblies language would not support a finding that the assembled handles were

within the scope.  Because Commerce itself based the reasoning of the Final Scope Ruling on

scope language *other* than the subassemblies provision, the court was not in a position to reach a

holding on whether the subassemblies provision could support a finding that the assembled

handles are subject merchandise.[4]  Instead, the court, as it was required to do, reached its holding

in *Whirlpool I* based on the reasoning Commerce put forth, and the court's observations as to the

subassemblies provision are, therefore, *dicta*.  As to the "parts" provision in the scope language,

---

[4] In the Remand Redetermination, Commerce again refrained from applying the
subassemblies provision.  Even had it applied the subassemblies provision, and even had it
somehow concluded that the assembled handles are only "partially assembled," it could not
plausibly have decided, as it did in the Final Scope Ruling, that the assembled handles are within
the scope.  By its express terms, the subassemblies provision is limited to "the aluminum
extrusion components" and "does not include the non-aluminum extrusion components of
subassemblies."  *AD Order*, 76 Fed. Reg. at 30,651; *CVD Order*, 76 Fed. Reg. at 30,654.  As it
did in the Final Scope Ruling, Commerce based its decision in the Remand Redetermination on
each assembled handle, considered as an entirety.

the question in *Whirlpool I* was not whether the assembled handles are "described at the time of

importation as parts for final finished products that are assembled after importation" within the

meaning of the scope language, *AD Order*, 76 Fed. Reg. at 30,650, *CVD Order*, 76 Fed. Reg. at

30,654.  The point the court made in *Whirlpool I* was that goods that are within the meaning of

this language do not necessarily fall within the scope.  *See Whirlpool I*, 40 CIT at __, 144 F.

Supp. 3d at 1302.  Instead, by the express limitation in the scope language, such goods are within

the scope only if they "otherwise meet the definition of aluminum extrusions," *AD Order*, 76

Fed. Reg. at 30,651, *CVD Order*, 76 Fed. Reg. at 30,654.

### 3.  Defendant-Intervenor's Comments on the Remand Redetermination

In opposing the Remand Redetermination, defendant-intervenor AEFTC puts forth

several arguments that the court rejects for the reasons discussed below.

AEFTC argues that the Department's finding in the Remand Redetermination that the

general scope language does not apply to the assembled handles is unreasonable and

"inconsistent with evidence on the record that shows that the handles match the physical

description of subject merchandise and are comprised entirely of extruded aluminum and

fasteners."  Def.-Int's Remand Comments 2.  According to AEFTC, "the 'fasteners' term is

properly understood as covering a much broader category of components than described by the

Court in its decision," *id.* at 5 (citation omitted), and should be construed to cover the plastic end

caps because these components serve an attachment function, *id.* at 5-6.  This argument is

unavailing.  The court's discussion of the "fasteners" question occurred in the hypothetical

context of the court's presuming, *arguendo*, that the scope language could be construed, as a

general matter, to encompass assembled goods such that the finished merchandise exclusion

would need to be considered.  *See Whirlpool I*, 40 CIT at __, 144 F. Supp. 3d at 1303-04.  Even

if the plastic end caps plausibly could be described as "fasteners," so describing them would not have cured the fundamental flaw in the Final Scope Ruling.  While the subassemblies provision (which Commerce did *not* invoke) can be interpreted as enlarging the scope to encompass an "extrusion" (as defined in the scope language) that is imported as a component of a partially assembled good, the general scope language, apart from the subassemblies provision, does not include assembled goods.  Rather, the general scope language defines extrusions as "shapes and forms, produced by an extrusion process."  *AD Order*, 76 Fed. Reg. at 30,650; *CVD Order*, 76 Fed. Reg. at 30,653.  The post-extrusion processes that do not remove an extrusion from the scope are specified in the scope language as drawing, fabricating and finishing.  *AD Order*, 76 Fed. Reg. at 30,650; *CVD Order*, 76 Fed. Reg. at 30,654.  An assembly process using an extrusion as a component in the production of another good is not included among those post-extrusion processes, and only the subassemblies provision refers to assembled goods.  The assembled handles, considered as a whole (which is how Commerce analyzed them in the Final Scope Ruling and the Remand Redetermination) cannot truthfully be described as shapes or forms produced by an extrusion process.  The uncontradicted record evidence is that they are, instead, the products of an assembly process.

AEFTC also argues that "the Court specifically recognized that aluminum extrusions containing non-extruded parts are covered under the scope, albeit under the description of partially-assembled merchandise."  Def.-Int.'s Remand Comments 6 (citation omitted).  This argument misunderstands *Whirlpool I* and misinterprets the scope language.  "Aluminum extrusions containing non-extruded parts" are *not* included in the scope, and the court did not decide that they were.  Under the terminology employed by the scope language, there can be no such thing as an aluminum extrusion that contains non-extruded parts.  If a single good contains

non-extruded parts, it is necessarily an assembly of parts and cannot fall within the definition of an "extrusion" that the scope language contains.  The subassemblies provision (which is not at issue in this case), by its own terms, can apply only to the aluminum extrusion components of a subassembly considered to be "partially assembled merchandise," not to the entire subassembly.

Finally, defendant-intervenor contends that Commerce was incorrect in refusing to engage in an analysis of Whirlpool's assembled handles under the exclusions to the general scope language, having already found that these handles are not within the general scope of the Orders.  *Id.* at 7-9.  According to AEFTC, because Commerce properly found Whirlpool's assembled handle to be within the general scope of the Orders in the Final Scope Ruling, an "assessment of whether Whirlpool's handles with end caps are eligible for exclusion as 'finished merchandise,' then, is appropriate and should render a finding that Whirlpool's handles with end caps remain ineligible for exclusion from the scope of the Orders, even as 'finished merchandise.'"  *Id.* at 7-8.  For the reasons provided in *Whirlpool I* and discussed above, the court views as correct the Department's decision, albeit made under protest, that the assembled handles are not covered by the general scope language to the Orders.  Therefore, the court will not disturb the Department's decision in the Remand Redetermination to refrain from engaging in an analysis of the exclusions to the scope.

### III. CONCLUSION

The court rules that Commerce was correct in deciding that Whirlpool's assembled handles are not within the scope of the Orders.  The court affirms this decision on the reasoning,

adopted by Commerce (albeit under protest), that the assembled handles are not described by the

general scope language of the Orders.  Judgment will enter accordingly.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Chief Judge

Dated:  August 26, 2016
        New York, New York